FOOD LION, INC., Plaintiff,

v.

CAPITAL CITIES/ABC, INC., ABC Holding Co., American Broadcasting Companies, Inc., Lynne Litt,[1] Richard N. Kaplan, Ira Rosen and Susan Barnett, Defendants.

No. 6:92CV00592.

United States District Court, M.D. North Carolina, Winston–Salem Division.

Aug. 29, 1997.

See also, 964 F.Supp. 956.

---

1. After this action was filed, Lynne Litt's name changed to Lynne Dale. Defendants filed a notice of name change but never filed a motion to change the caption. Dale was the name most used during trial. That name will be used here despite the appearance of the name "Lynne Litt" in the caption.

Timothy G. Barber, Charlotte, NC, Andrew Copenhaver, David A. Shirlen, Elizabeth B. McGee, Winston–Salem, NC, John J. Walsh, New York City, Richard L. Wyatt, Jr., Washington, DC, Charles Porter, Columbia, SC, for Plaintiff.

H. Hugh Stevens, Jr., Raleigh, NC, Randall J. Turk, William H. Jeffress, Jr., Washington, DC, Douglas M. Martin, Charlotte, NC, Bruce W. Sanford, Washington, DC, for Defendants.

## MEMORANDUM OPINION

TILLEY, District Judge.

This matter was tried to a jury beginning on December 9, 1996. The jury returned verdicts in favor of Plaintiff and found Defendants liable for fraud, trespass, and a breach of the duty of loyalty. The jury found that Plaintiff suffered $1,402.00 in compensatory damages on those claims and awarded a total of $5,545,750.00 in punitive damages for the fraud claim. In addition, the Court, applying the factual findings of the jury, determined that Defendants had committed a violation of the North Carolina Unfair and Deceptive Trade Practices Act. Defendants have filed three post-trial motions: (1) Motion Pursuant to Rule 50 for Judgment as a Matter of Law on Plaintiff's Claims of Fraud, Trespass, and Breach of Fiduciary Duty; (2) Motion for New Trial or Remittitur of Punitive Damage Award; and (3) Motion for Judgment as a Matter of Constitutional Law on Punitive Damages. In addition Defendant Capital Cities/ABC has filed a Motion for Judgment as a Matter of Law on All Claims.

### I.

In 1992, Defendants Lynne Dale and Susan Barnett were both employed by the ABC news magazine program *PrimeTime Live.* The television show at some point determined that it would prepare and broadcast a story on Food Lion stores. In an attempt to gain access to parts of Food Lion stores not generally open to the public, Dale and Barnett applied for positions of employment with Food Lion. Both provided false information to Food Lion in order to obtain a position. Dale indicated that she had prior experience as a meat wrapper. She provided false references, a false employment background, and a false address. Barnett also provided false references, a false employment history, a false address and a false phone number. Each omitted any reference to her employer, ABC, and her true reason for seeking employment. Barnett was eventually employed as a deli clerk in a store in South Carolina. Dale was employed as a meat wrapper in North Carolina. During the brief period of their employment each wore a hidden camera, secreted in a wig, into work areas and recorded video footage. Some of this footage was ultimately used in a *PrimeTime Live* broadcast which was highly critical of Food Lion. This lawsuit arose as a result of these actions.

### II.

### Judgment as a Matter of Law on Fraud, Trespass, and Breach of Fiduciary Duty

A. Standard

The text of Federal Rule of Civil Procedure 50(b) states, in part,

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

 (a) allow the judgment to stand,

 (b) order a new trial, or

 (c) direct entry of judgment as a matter of law

The Fourth Circuit has stated that "[j]udgment as a matter of law is proper 'when without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.'" *Price v. City of Charlotte*, 93 F.3d 1241, 1249 (4th Cir.1996) (citations omitted), *cert. denied*, — U.S. ——, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997). "To grant the motion the district court must examine the evidence in the light most favorable to the non-moving party ..." *Brown v. CSX Transp., Inc.*, 18 F.3d 245, 248 (4th Cir.1994). Further, "[t]he movant is entitled to judgment as a matter of law 'if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof.'" *Id.* (citations omitted). In addition, the court has said that "[a]lthough sometimes worded differently depending on the timing of the motion, the standard for reviewing the denial of a pre-verdict and a post-verdict motion for judgment as a matter of law is essentially the same." *Benner v. Nationwide Mut. Ins. Co.*, 93 F.3d 1228, 1234 n. 8 (4th Cir.1996). Generally, "a Rule 50(a) motion is a prerequisite to a Rule 50(b) motion because the [movant] must apprise the district court of the alleged insufficiency of [the non-movant's] suit before the case is submitted to the jury." *Price*, 93 F.3d at 1249. "Traditionally, [a movant] is required to have raised the reason for which it is entitled to judgment as a matter of law in its Rule 50(a) motion before the case is submitted to the jury and reassert that reason in its rule 50(b) motion after trial if the Rule 50(a) motion is denied." *Id.* at 1248. Therefore, a party is generally precluded from raising issues in a renewed motion that were not raised in the original motion.

## B. Fraud

Defendants advance three basic arguments in support of their renewed motion for judgment as a matter of law on the fraud claim. The first is that "resume fraud" is not actionable under a fraud theory. The second is that Food Lion affirmed the employment contract and cannot now seek to recover damages based on rescission or avoidance of contract. The final contention is that Food Lion can show no damages proximately caused by the misrepresentation.

The first argument, that "resume fraud" is not actionable under a fraud theory, was discussed before trial in the Memorandum Opinion disposing of Defendants' Motion for Summary Judgment, *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F.Supp. 1217 (M.D.N.C.1996). Defendants have presented no new arguments on this point and have offered no new information which dictates that those conclusions be altered.[2] Therefore, Defendants first contention is rejected for the reasons stated in that opinion.

Defendants second contention is that Plaintiff was required to elect its remedies under the contract and, having elected to pursue theories such as copyright and breach of loyalty claims, cannot pursue remedies of rescission. This argument was not part of the motion for judgment as a matter of law made during trial. (*See*, Trial Tr. at 1350–67). An argument not made in support of a 50(a) motion may not be the subject of a renewed motion for judgment as a matter of law under Rule 50(b). Defendants argue that this argument was made in their Motion for Summary Judgment before trial. That document has been reviewed but the argument is not stated sufficiently to preserve it for a post-trial judgment as a matter of law consideration.

The third contention is that there were no damages proximately caused by the misrepresentations and, therefore, the element of fraud which requires a cognizable injury is not satisfied. This argument is based on the fact that much of Plaintiff's evidence of compensatory damage revolved around the costs associated with hiring and training new employees. Defendants argue that even if Dale and Barnett had not applied and been hired by Food Lion the company would have had to fill the open positions and would have incurred the hiring costs anyway. Food Lion counters by arguing that, had Dale and Barnett been "true employees" with the intent of honestly taking a Food

2. In fact, Defendants make the argument that concealment of a "true reason" for seeking employment cannot be the basis of a fraud claim. The jury in this case was never instructed that such a concealment could be the basis for a fraud claim.

Lion job, they would not have had to incur the hiring and training costs twice—once with Dale and Barnett and a second time when they each quit after a short period of time and others had to be hired to fill the positions. From the evidence presented, this Court cannot conclude that no reasonable jury could have found damage as a result of the misrepresentations.

## C. Trespass

Defendants make three arguments in support of their motion for judgment as a matter of law on the trespass claim: (1) Food Lion ratified the employment and cannot claim that consent to trespass was involuntary; (2) the fraud in this case is not sufficient to negate consent to enter; and (3) the breach of the duty of loyalty is not sufficient to negate consent to enter. All of these arguments fail.

The first argument is that Food Lion ratified the employment by making copyright claims and breach of the duty of loyalty claims. Therefore, the argument continues, Food Lion cannot argue that the actions of Dale and Barnett negated the consent to enter and turned them into trespassers. As with this contention in the fraud context, Defendants did not raise it in their Rule 50(a) motion during trial nor was it raised in their Motion for Summary Judgment prior to trial. Therefore, this argument is not a proper one for review under Rule 50(b).

Further, the remaining two arguments were disposed of prior to trial. Defendants have added nothing, at this stage, to their pretrial arguments which dictates that the pretrial conclusions be altered. Therefore, the Rule 50(b) motion on these issues is denied for the reasons stated in *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F.Supp. 1217 (M.D.N.C.1996).

## D. The Duty of Loyalty

Defendants argue that there is no duty of loyalty in this context under North Carolina and South Carolina law. They argue that Dale and Barnett did not have a confidential relationship with Food Lion and that, therefore, they owed no duty of loyalty toward Food Lion. Defendants' arguments are the same as those that were made and rejected prior to the trial. Those arguments have been reviewed again and are rejected for the reasons stated in *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 951 F.Supp. 1224 (M.D.N.C.1996).

## E. Impact of the First Amendment

Defendants urge the Court to reject the application of these torts to them because, they argue, it would have a chilling effect on news gathering which would violate the First Amendment. This topic, of course, has been one of frequent discussion in this case and it will be discussed further below. However, in this context, application of these torts to Defendants is not prohibited by the First Amendment. As has long been noted by the courts of this land, the press is not free to violate laws of general applicability in order to reach its ultimate goals. *See, e.g., Cohen v. Cowles Media Co.*, 501 U.S. 663, 669–70, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586 (1991). In *Cohen v. Cowles Media*, the Supreme Court recognized the "well-established line of decisions holding that generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Id.* at 669, 111 S.Ct. at 2518. Furthermore, the Supreme Court "has emphasized that '[t]he publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others.'" *Branzburg v. Hayes*, 408 U.S. 665, 683, 92 S.Ct. at 2657 (citing *Associated Press v. N.L.R.B.*, 301 U.S. 103, 132–33, 57 S.Ct. 650, 655–56, 81 L.Ed. 953 (1937)). The *Branzburg* Court also noted that "[i]t has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684, 92 S.Ct. at 2658. Application of these torts to these Defendants does not violate the First Amendment.

## III.

### Motion by Capital Cities/ABC, Inc. for Judgment on All Claims

Capital Cities/ABC moves for judgment as a matter of law on all claims. The basis for

this motion is that Capital Cities was found liable for fraud on the basis of the actions of Jonathan Barzilay, an attorney in the Capital Cities legal department. Capital Cities makes the argument that the actions of Jonathan Barzilay are not sufficient, as a matter of law, to draw in Capital Cities as a joint tortfeasor. The argument is based on the fact that Barzilay is an attorney and the contention that, as an attorney, his liability for advice given runs only to his client and not to a third party. While this argument might have merit upon further investigation, it is not properly before the court.

 Food Lion makes the argument that Defendants are barred from asserting this argument at this stage because they failed to raise the argument in their Rule 50(a) motion during trial. Defendants argue that their Rule 50(a) motion did preserve this argument. As the Fourth Circuit has noted "[t]he requirement of a proper [judgment as a matter of law] motion as foundation for a motion for [judgment as a matter of law] under [Rule] 50(b) is not a mere technicality; it serves vitally important interests in the fair conduct of litigation." *Miller v. Premier Corp.,* 608 F.2d 973, 979 n. 3 (4th Cir.1979). Further,

> Rule 50(b) is essentially a notice provision that, among other functions, protects the important seventh amendment right of trial by jury. A motion for [Judgment as Matter of Law under Rule 50(b) ] must be preceded by a motion for [Judgment as a Matter of Law under Rule 50(a) ] sufficiently specific to afford the party against whom the motion is directed an opportunity
>
> > 'to cure possible technical defects in proof which might otherwise make his case legally insufficient. A motion for [Judgment as a Matter of Law] made after trial, in the absence of prior notice of the alleged defect, comes too late for possibly curative action, short of a completely new trial.'

*Acosta v. Honda Motor Co., Ltd.,* 717 F.2d 828, 831–32 (3d Cir.1983) (citations omitted) (cited with approval in *Livingston Chemicals, Inc. v. Permviro Systems, Inc.,* No. 92–1063, 1992 WL 374024 (4th Cir. June 14, 1992) (unpublished)). Therefore, a "court should not hesitate to enforce [the requirement of Rule 50] where the record shows a clear failure by counsel to observe it, no matter how meritorious may be the arguments of the insufficiency of evidence presented." *Miller,* 608 F.2d at 979 n. 3. In this case the argument that Capital Cities could not be liable for fraud because Jonathan Barzilay is an attorney whose liability runs only to his client was not made in a form sufficient to preserve it for a Rule 50(b) motion. Defendants contend that the argument was made during the Rule 50(a) motion. (Trial Tr. at 1361 line 18 to 1362 line 5). However, the statements made about Mr. Barzilay at that time were insufficient to put either Food Lion or the Court on notice that this argument was being advanced. The statements were encompassed within an argument about conspiracy between a parent corporation and a wholly owned subsidiary. In the context of a verbal motion at trial, the argument was not sufficiently articulated to be recognized by the Court and opposing counsel as a basis on which Capital Cities was claiming that it deserved Judgment as a Matter of Law. In addition, before making the verbal motion, Capital Cities filed a Supplemental Memorandum of Law stating the reasons it felt that it deserved judgment as a matter of law. Nowhere in that motion is the current argument articulated. The fact that Food Lion was not on notice that this argument was being advanced is clear from Food Lion's response to Capital Cities motion under Rule 50(a). Food Lion, in that response, stated that "Capital Cities is liable on a respondeat superior basis for anything that Jonathan Barzilay did. I didn't hear any argument about that, so I don't know that I need to address it." (Trial Tr. at 1377 line 10 to line 13). Certainly, Food Lion was not on notice that Capital Cities was claiming that it could not be liable because Jonathan Barzilay is an attorney and, therefore, could not serve as a source of liability to a third party.

The jury was asked whether Capital Cities committed fraud through the actions of Jonathan Barzilay. Food Lion claimed that it had evidence that other players in this action

acted on behalf of Capital Cities. (Trial Tr. at 1377–78; Pl's Opp'n to Motion by Capital Cities/ABC, Inc. for Judgment on all Claims, at 1 n. 1). If Food Lion had presented such evidence or had further evidence on that point to present, a proper Rule 50(a) motion would have put it on notice that it needed to present all such evidence and that it needed to request a jury instruction which encompassed the actions of others in addition to Barzilay. Since Food Lion was not on notice, however, it never had the opportunity to recognize a need to present further evidence on this point or to request a different jury instruction. The failure to raise the argument prevented any curative action by Food Lion or remedial action by the Court. Therefore, under Rule 50(b) Capital Cities is precluded from raising this argument and it will not be addressed on the merits.

### IV.

#### Motion for Judgment as a Matter of Constitutional Law on Punitive Damages

Defendants move for judgment as a matter of law on Punitive Damages, claiming that the First Amendment prohibits an award of punitive damages in this case because of the chilling effect such an award might have on news gathering. Plaintiff first argues that Defendants failed to raise this argument under Rule 50(a) during trial and that, therefore, they are precluded from raising the argument now. It is true, as Plaintiff claims, that Defendants made no Rule 50(a) motion during the punitive damages phase of the trial. This argument was not raised at that time. However, Defendants claim that they sufficiently preserved this argument by moving, before trial, for dismissal of Food Lion's fraud claims on the basis that such claims would violate the First Amendment. Further, they claim that the argument was preserved by Defendants' Memorandum on Admissibility of Evidence of Compensatory and Punitive Damages which was filed after the liability phase of the trial but before the compensatory damage and punitive damage phases of the trial. Further, Defendants contend that, even if the argument was not properly preserved, an appellate court would review it under the plain error standard and that, therefore, this court should allow review as well. It is questionable whether the argument was properly preserved by the documents filed before trial and before the punitive damages phase, however, if the First Amendment does bar punitive damages in this situation, this issue is one that an appellate court might review for plain error. *See, e.g., Singer v. Dungan,* 45 F.3d 823, 827–28 (4th Cir.1995) (reviewing an issue even though it was not properly preserved under Rule 50 to prevent a potential "manifest miscarriage of justice"). Therefore, this Court will examine the merits of the issue.

■■■ Defendants claim that punitive damages may not be awarded against them because the torts were committed in the process of news gathering and, therefore, an award of punitive damages could have a chilling effect on the media. News gathering is a protected First Amendment activity. *See Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656 (1972). Therefore, there must be certain protections for that activity so that freedom of the press will not be squelched. At the same time, "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of North America, Inc. v. Gore,* 517 U.S 559, ——, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). The determination of this issue involves a balancing of those competing interests.

■■■ The Supreme Court has concluded that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information." *Smith v. Daily Mail Pub. Co.,* 443 U.S. 97, 103, 99 S.Ct. 2667, 2670, 61 L.Ed.2d 399 (1979). While that case focused on the publication of the information, this case focuses on the gathering of the information. The punitive damages awarded in this case do not punish the publication of information but rather punish the actors for the tortious activities undertaken in gathering that information. Therefore, an issue which was not decided in the *Daily Mail* case and which

has not been decided since is present in this case. That issue is whether a state may constitutionally punish a media organization for the illegal gathering of information. Defendants, of course, answer that issue in the negative. They argue that *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) controls the outcome. In that case, the Supreme Court determined that presumed and punitive damages could not be awarded in a libel suit absent a finding of actual malice. *Id.* at 349, 94 S.Ct. at 3011. On the topic of punitive damages, the Court stated

> We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation. In most jurisdictions jury discretion over the amounts awarded is limited only by the gentle rule that they not be excessive. Consequently, juries assess punitive damages in wholly unpredictable amounts bearing no necessary relation to the actual harm caused. And they remain free to use their discretion selectively to punish expressions of unpopular views. Like the doctrine of presumed damages, jury discretion to award punitive damages unnecessarily exacerbates the danger of media self-censorship, but, unlike the former rule, punitive damages are wholly irrelevant to the state interest that justifies a negligence standard for private defamation actions. They are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury.

*Id.* at 350, 94 S.Ct. at 3012. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, the Supreme Court limited the principles in

*Gertz* and concluded that "[i]n light of the reduced constitutional value of speech involving no matters of public concern, we hold that the state interest adequately supports awards of presumed and punitive damages— even absent a showing of 'actual malice.'" 472 U.S. 749, 761, 105 S.Ct. 2939, 2946, 86 L.Ed.2d 593 (1985). Defendants argue that the standard in *Gertz* still dictates that Food Lion be limited to compensatory damages in this case.

 The *Gertz* principle certainly stands for the proposition that, when information is published about a matter of public interest, punitive damages may not be awarded for falsity that is merely negligent. Rather, for punitive damages to be properly awarded, there must be a finding of intent or actual malice. A publisher acts with actual malice if that person acts with "knowledge that [the information] is false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). For the jury to award punitive damages in this case, it was required to find that Defendants acted with a consciousness of wrongdoing. Therefore, the jury was required to find a form of intent in the actions taken by Defendants in order for them to award punitive damages. The relationship of consciousness of wrongdoing to the torts in this case is, in the view of this Court, the same type of relationship that actual malice has to the tort of libel. The higher threshold that must be reached before punitive damages are awarded satisfies the dictates of *Gertz* and provides protection for a member of the press who acts negligently or without intent to violate generally applicable laws. Despite the many protections necessary for the proper operation of the press, it would be a peculiar rule indeed which immunized illegal activity, undertaken with a consciousness of wrongdoing,[3] from punishment and deterrence through punitive damages.

---

**3.** Defendants did not object to the instruction concerning the consciousness of wrongdoing on the basis of constitutional concerns. If Defendants felt that Plaintiff needed to make a certain showing in order to pass constitutional muster and that the instruction did not rise to that level,

Defendants should have objected at a time when the instruction could have been cured. Failure to properly object results in a waiver of the issue. *See, e.g., Sims v. Mulcahy*, 902 F.2d 524, 535–36 (7th Cir.1990), *cert. denied*, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990).

## V.

### Motion for New Trial or Remittitur of Punitive Damage Award

Defendants' final motion is one for a new trial or remittitur of the punitive damage award. This motion is based, in part, on the contention that the punitive damage award in this case violates the Due Process Clause of the United States Constitution according to the dictates established in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). For the reasons set out more fully below, the motion for a new trial is denied on the condition that Plaintiff file a remittitur as to part of the punitive damage award.

■ The Supreme Court has recognized that punitive damage awards may be so excessive as to violate the Due Process Clause of the Constitution. *See, Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In *BMW,* the Supreme Court determined that a punitive damage award of two million dollars in a case where the defendant failed to inform the plaintiff that the car he purchased had been repainted, an act which resulted in four thousand dollars in actual damage, violated due process. The Supreme Court examined three factors to determine whether the punitive damage award was proper: (1) the degree of reprehensibility; (2) the disparity between the harm or potential harm suffered by Plaintiff and his punitive damage award; and (3) the differences between this remedy and the penalties authorized or imposed in comparable cases. *Id.,* 517 U.S. at ———–———, 116 S.Ct. at 1598–99.

■ During the same term that the Supreme Court decided BMW, it also announced a decision in *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). In that case, one issue was whether a federal court sitting in diversity should apply state, as opposed to federal, principles of damages. New York has a statute which requires appellate courts to review a damage award to determine if it "deviates materially" from what would be reasonable compensation. The Court determined that the statute imposed a standard of review which is more strict than the federal "shocks the conscience" test. *Id. at* ———, 116 S.Ct. at 2218. Concluding that the statute was both substantive and procedural, the Court determined that a federal court sitting in diversity in New York should apply the statute to review damage awards. *Id.* at ———, 116 S.Ct. at 2221. At least one district court has since determined that the *Gasperini* case applies only to situations where there is a "state statute governing awards that 'materially deviate' from awards in similar cases." *Torres v. Wendco of Puerto Rico, Inc.,* No. 95–1544, 1997 WL 135682, at *4 (D. Puerto Rico Jan. 15, 1997) (unpublished). However, in an unpublished opinion, the Fourth Circuit directed a district court, in light of *Gasperini,* to consider a punitive damage award under the common law principles set out in cases in South Carolina. *Martin v. Diamant Boart America, Inc.,* No. 96–1414, 1997 WL 286123, at *3–4 (4th Cir. May 30, 1997) (unpublished). In a footnote, the Fourth Circuit stated that "[i]n light of the remand on the punitive damages issue, we need not reach [Defendant's] contention that the jury's verdict exceeded the constitutional standards set forth in *BMW.*" *Id.* at *4. Thus, the Fourth Circuit indicated that a court would only need to consider the *BMW* principles after the state due process principles had been considered. Therefore, this Court will consider the punitive damage awards under the applicable state laws in North and South Carolina.

■ In South Carolina, "punitive damages are allowed in the interests of society in the nature of punishment and as a warning and example to deter the wrongdoer and others from committing like offenses in the future." *Laird v. Nationwide Ins. Co.,* 243 S.C. 388, 134 S.E.2d 206, 210 (1964). The South Carolina Supreme Court has set out several factors to be used by a trial court conducting a post-trial review of a punitive damage award. Those factors are: (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or

concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) the defendant's ability to pay; (8) other factors deemed appropriate. *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350, 354 (1991). There are three stages for awarding punitive damages in South Carolina:

> First, the court must determine whether the defendant's conduct rises to the level of culpability warranting a punitive damage award.... Second, the trial judge must conduct a post-trial [*Gamble v. Stevenson*] review to ensure that the award does not deprive the defendant of due process.... If the award is determined not to violate the defendant's due process rights, then the trial court reaches the third inquiry, to wit, whether, in the exercise of its discretion, it finds the award excessive or inadequate.

*South Carolina Farm Bureau Mut. Ins. Co. v. Love Chevrolet, Inc.*, 324 S.C. 149, 478 S.E.2d 57, 59 (1996).

▬▬▬ In North Carolina, punitive damages "are awarded as punishment due to the outrageous nature of the wrongdoer's conduct." *Juarez–Martinez v. Deans*, 108 N.C.App 486, 424 S.E.2d 154, 159–60 (1993), *rev. denied*, 333 N.C. 539, 429 S.E.2d 558 (1993). The amount of damages awarded "rests in the sound discretion of the jury although the amount is not to be excessively disproportionate to the circumstances of contumely and indignity present in the case."

*Carawan v. Tate*, 53 N.C.App. 161, 280 S.E.2d 528, 531 (1981), *modified and aff'd*, 304 N.C. 696, 286 S.E.2d 99 (1982). Furthermore, "[p]unitive damages are never awarded merely because of a personal injury inflicted nor are they measured by the extent of the injury; they are awarded because of the outrageous nature of the wrongdoer's conduct." *Cavin's Inc. v. Atlantic Mut. Ins. Co.*, 27 N.C.App. 698, 220 S.E.2d 403, 406 (1975). "The jury's discretion in awarding punitive damages must be exercised 'within reasonable constraints' in order to satisfy due process." *Maintenance Equip. Co., Inc. v. Godley Builders*, 107 N.C.App. 343, 420 S.E.2d 199, 205 (1992).[4] In most instances, the North Carolina standards are subsumed in the *BMW* due process standards and will be discussed within the *BMW* guideposts.

As an initial matter, it should be noted that the damage award against each Defendant will be looked at separately. Defendants tend to lump the entire punitive damage award together in their argument. However, part of each award was made to vindicate South Carolina interests and part to vindicate North Carolina interests. In addition, when there are multiple wrongdoers, it accords with common sense to look at the award against each wrongdoer separately.[5]

### A. Due Process Considerations

Because the North Carolina considerations as well as a majority of the South Carolina factors are included in the three *BMW* guideposts, those guideposts will be the starting point here. They provide a useful

---

**4.** In addition, the North Carolina General Assembly passed a statute which sets out certain factors to be examined. N.C. Gen.Stat. § 1D–35. Those factors include: (1) the reprehensibility of the defendant's motives and conduct; (2) the likelihood, at the relevant time, of serious harm; (3) the degree of the defendant's awareness of the probable consequences of its conduct; (4) the duration of the defendant's conduct; (5) the actual damages suffered by the claimant; (6) any concealment by the defendant of the facts or consequences of its conduct; (7) the existence and frequency of any similar past conduct by the defendant; (8) whether the defendant profited from the conduct; and (9) the defendant's ability to pay punitive damages, as evidenced by its revenues or net worth. The legislature expressly determined, however, that the statute would not

be applicable to claims arising before January 1, 1996. N.C. Gen.Stat. § 1D–1 (editor's note). Therefore, these factors will not be applied here.

**5.** The only practical difficulty that comes with looking at each award separately is that the compensatory damages were not separated according to the part played by each Defendant. There was, however, no rational way to apportion damages according to the part played by each Defendant. In this regard, the case is not unlike *Cooper v. Casey*, where the Seventh Circuit stated that, due to the nature of the injuries and actions in the case, "the contributions of the individual defendants could not be distinguished." 97 F.3d 914, 919 (7th Cir.1996).

road map for navigating the state standards even apart from their federal due process review function.

### 1. Degree of Reprehensibility [6]

The Supreme Court has stated that "[p]erhaps the most important indicium of the reasonableness of a punitive damage award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at ——, 116 S.Ct. at 1599. The Court further noted that "[t]his principle reflects the accepted view that some wrongs are more blameworthy than others." *Id.* Purely economic harm, as is present here, may be less aggravating than harm which potentially impacts health or safety. *Id.* In addition, "evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Id.*

This case involved deliberate false statements. The Supreme Court has noted that the "omission of a material fact may be less reprehensible than a deliberate false statement." *Id.* at ——, 116 S.Ct. at 1601. Here, deliberate, and sometimes quite elaborate, false statements were prepared for submission to Food Lion for the sole purpose of deceiving Food Lion. The actual duration of the operation was relatively short in that the employment applications were submitted within a span of several weeks and each producer worked for Food Lion only for a short period of time. A greater period of time was spent developing and implementing the scheme. There was evidence that ABC had, on previous occasions, created deliberate deceptions for the purpose of securing jobs with companies which were the target of an investigative report. This case, however, was the first time ABC's actions in this regard were found to be unlawful.

### 2. Ratio

Although the Supreme Court has "consistently rejected the notion that the constitu-

tional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award," *id.* at ——, 116 S.Ct. at 1602, the Court also stated that "[t]he principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree." *Id.* at ——, 116 S.Ct. at 1601. Plaintiff argues that the harm which could have resulted from the scheme justifies a different ratio. In fact, the Supreme Court has noted that "the proper inquiry is 'whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred.'" *Id.* at ——, 116 S.Ct. at 1602 (citations omitted). There may have been a greater potential for actual harm because the ABC employees handled food in their Food Lion jobs. Lynne Dale was employed as a meat wrapper, a position which requires some training. She represented she had prior experience when, in fact, she did not. Furthermore, both ABC employees worked with food while they had potentially divided loyalties. Such a circumstance could certainly give rise to a situation where actions are taken in support of loyalty to ABC and against the better interests of Food Lion. If, for instance, an ABC employee working at Food Lion put out-of-date products out for sale on her own initiative and a Food Lion customer became ill and either discontinued his patronage of Food Lion or sued Food Lion, the potential harm would certainly be greater than the $1,400.00 reflected in compensatory damages. The amount of harm that could have been created is virtually open-ended and impossible to quantify. This is not a situation, like the Supreme Court faced in *TXO*, where the amount of potential harm is more readily ascertainable by reference to objective sets of figures. *See TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 461–62, 113 S.Ct. 2711, 2722, 125 L.Ed.2d 366 (1993) (assessing potential harm by reference to royalties payments which would have been lost if the scheme had succeeded). Instead, in this case, any assessment of potential

---

**6.** Several of the South Carolina factors are covered by the "degree of reprehensibility" consideration. These factors include: (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; and (4) the existence of similar past conduct.

harm would be impermissibly speculative. In lieu of arriving at a speculative figure, the ratio of punitive damage to actual damage will be viewed with the knowledge that the potential harm could have been much greater than the actual harm found here.

### 3. Sanctions for Comparable Misconduct

The Supreme Court noted that "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." Through this factor, courts give deference to the judgment of the legislatures and their determination of the punishments warranted by certain offenses.

ABC argues that the most helpful statute is North Carolina's new punitive damages statute. *See*, N.C. Gen.Stat. § 1D–25 (1996). In that statute, the North Carolina General Assembly set a punitive damages cap of the greater of three times the compensatory damage award or $250,000. However, in passing that statute, the General Assembly determined that the statute should not be made retroactive. By making that determination, the legislature indicated that the prior standards which governed punitive damages should apply to claims arising before January 1, 1996. N.C. Gen.Stat. § 1D–1 (editor's note). Therefore, that statute does not provide much guidance in this case.

There are criminal provisions in both North Carolina and South Carolina that indicate the states' view of fraud. In North Carolina, the offense of obtaining property by false pretenses was, in 1992, punishable by three years to ten years imprisonment. N.C. Gen.Stat. § 14–100. In South Carolina, the offense of obtaining signature or property by false pretenses was punishable in 1992 by a maximum of three years in prison. S.C.Code Ann. § 16–13–240. ABC argues that these statutes are not applicable here because they require "proof of intent to cheat or defraud the victim of money or something of value." (Defs.' Reply to Pl.'s Opp'n to Defs.' Motion for New Trial or Remittitur, at 11). However, valuable items were involved here, for instance: jobs; wages; and time taken to train employees. There are also more intangible items of value including the right to make hiring decisions based on accurate information. Although there is no suggestion that Defendants could or should be criminally prosecuted for their actions, the legislative judgments surrounding the offense of obtaining property by false pretenses can provide some guidance of the legislative view of this type of activity.

When criminal sanctions are involved, monetary sanctions necessarily pale in comparison. Therefore, the legislative judgment that actions not entirely remote from the actions here be punishable by imprisonment weighs in favor of allowing much of the monetary sanction to stand.

### 4. Additional South Carolina factors

Many of the factors set out by South Carolina, as previously noted, are encompassed in the above *BMW* considerations. Perhaps there are two factors not discussed above which merit some mention here.

The first factor is the defendant's ability to pay. There was significant evidence at trial concerning the wealth of the various Defendants. Clearly, Capital Cities is a very large corporation and can afford to pay the full amount of the punitive damage award. ABC is also a large company and would not have difficulty paying the award. Richard Kaplan made $700,000 in 1993. Such a salary would indicate that he is able to pay $35,000. In 1993, Ira Rosen made $215,000. Such a salary would indicate that he is able to pay $10,750.

The second factor that merits some discussion is the likelihood that the award will deter the defendant and others from like conduct. Although a significant amount might be necessary to deter a large corporation from engaging in an activity which, although illegal, results in only minor actual harm, it is unclear what weight can be afforded to such a consideration. The Supreme Court noted that "[t]he fact that [the defendant] is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business." *BMW*, 517 U.S. at ——, 116

S.Ct. at 1604. However, three of the five justices who joined the majority opinion also joined in a concurring opinion. In the concurrence, the justices discussed several factors that the Alabama courts used to determine whether punitive damage awards are excessive. The discussion of two of those factors, a requirement that punitive damages remove the profit of the illegal activity and a requirement that the financial position of the defendant be examined, might be relevant here. The concurrence stated that the factor requiring punitive damages to remove the profit of the illegal activity "has the ability to limit awards to a fixed, rational amount." *Id.* at ——, 116 S.Ct. at 1606 (Breyer, J., joined by O'Conner, J., and Souter, J., concurring). The discussion of the requirement that the financial position of the defendant be considered ends by recognizing that

> [t]his factor ... is not necessarily intended to act as a significant constraint on punitive awards. Rather, it provides an open-ended basis for inflating awards when the defendant is wealthy.... That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as "reprehensibility," to constrain significantly an award that purports to punish a defendant's conduct.

*Id.* at ——, 116 S.Ct. at 1607 (concurring opinion). The discussion of these factors indicates that some consideration of South Carolina's "likelihood that the award will deter the defendant" factor is still appropriate. However, the discussion also indicates that this factor alone cannot outweigh other factors, such as reprehensibility, which seek to constrain the size of punitive damage awards. In addition, although the Supreme Court only discussed three factors in the majority opinion, the majority did not state that those factors were the only ones which could properly be considered. Instead, the opinion states "[t]hree guideposts ... lead us to the conclusion that the $2 million award against *BMW* is grossly excessive." *Id.* at ——, 116 S.Ct. at 1598. That statement, combined with the concurrence's discussion of additional factors, indicates that factors in addition to the three *BMW* guideposts may appropriately be considered.

In addition, the ratio in South Carolina only encompasses the part of each punitive damage award given for the actions which took place in South Carolina. Therefore, the ratio of the actual and potential harm under the South Carolina factors is much lower than the ratio of the harm to the overall punitive award.

### B. Application

#### 1. Capital Cities/ABC, Inc.

 The jury awarded Food Lion $2,000,000 in punitive damages for fraud committed by Capital Cities/ABC, Inc. employees in South Carolina and $2,000,000 for fraud committed by Capital Cities/ABC, Inc. employees in North Carolina. The only evidence involving an employee of Capital Cities/ABC, Inc. was the evidence involving Jonathan Barzilay, an attorney with Capital Cities. The evidence, viewed in the light most favorable to Plaintiff, was that Barzilay was asked to render a legal opinion and responded that, so long as the undercover reporters performed their Food Lion jobs, there would be no fraud. The evidence also would support a finding that the undercover investigation would not have taken place if the legal department refused to approve the plan. As previously mentioned, Capital Cities has argued that it cannot be liable for fraud because the party acting on its behalf was an attorney offering legal advice. *See supra*, Part III. That argument was not addressed under the motion for judgment as a matter of law because Capital Cities failed to make the argument during trial. However, the fact that the only employee involved from the perspective of Capital Cities was an attorney offering legal advice is a proper consideration in determining support for the punitive damage award.

The evidence regarding the actions of Jonathan Barzilay did not indicate that his activities were particularly reprehensible. He offered legal advice which, viewing the evidence in the light most favorable to Plaintiff, allowed the undercover investigation to go forward.

The ratio of the overall punitive damage award assessed against Capital Cities/ABC, Inc. to the compensatory damage award is approximately 2,857 to 1. A ratio of 2,857 to 1 is certainly suspect. Even when looking at the reduced ratio which factors in potential as well as actual harm, the ratio is disproportionate. When the disproportionate ratio is considered alongside the relatively minor involvement of Capital Cities through Jonathan Barzilay, the award becomes constitutionally unsustainable.

Although a large award might be needed to deter a large corporation such as Capital Cities from engaging in this type conduct in the future, an award large enough to deter cannot survive under the countervailing factors, such as reprehensibility. Therefore, based on the three factors set out by the Supreme Court in *BMW*, as well as the factors examined in South Carolina and the governing principles in North Carolina, the punitive damage award against Capital Cities/ABC, Inc. cannot survive due process. The ratio of the actual and potential harm to the punitive damage award is far in excess of those normally allowed. In addition, the actions of Jonathan Barzilay, the only employee of Capital Cities/ABC, Inc. involved, are not sufficiently reprehensible to support this award. Neither North Carolina nor South Carolina needs a $2,000,000 award to satisfy the principles of deterrence and punishment warranted by the laws of those states. A new trial will therefore be ordered unless Food Lion files a remittitur of all amounts of the punitive damage award against Capital Cities over $50,000. This will leave an award of $25,000 for the actions in North Carolina and $25,000 for the actions in South Carolina.

2. American Broadcasting Companies, Inc.

■ The jury awarded $750,000 in punitive damages for the actions of the ABC employees in South Carolina and $750,000 for the actions in North Carolina. ABC is responsible for the actions of all of its employees, including Susan Barnett, Lynne Dale, Ira Rosen, and Richard Kaplan. Therefore, the evidence about the plan for, the implementation of, and results of the investigation are primarily the responsibility of ABC.

ABC, to the extent that blame is levied on any Defendant, is the party who should take the greater portion. All of the individuals involved in the investigation, with the exception of Jonathan Barzilay, worked for ABC. ABC employees planned, approved, and carried out the fraud. While ABC has always maintained that it believed no laws would be violated, ABC employees determined that it was appropriate to make deliberate false statements to achieve their ultimate goals. In addition, ABC employees accepted Food Lion positions involving the handling of food. Lynne Dale represented that she had experience as a meat wrapper when, in fact, she did not. Although there was no evidence regarding whether ineffective meat wrapping can result in spoilage or contamination of the meat or other damage, it certainly seems to have the potential of doing so. Both Dale and Barnett were in positions where each could exercise her judgment to determine when food should be discarded and when it should be kept and put out for sale. If an employee, in such a situation, puts out-of-date food out for sale without being directed to do so by a superior and the out-of-date product results in harm to a consumer, then that harm would ultimately be the product of divided loyalties. In short, ABC knowingly made false representations for the purpose of securing positions where loyalties were potentially antagonistic and where harm to both Food Lion and consumers was shielded only by the personal conscience of individuals whose loyalties—regardless of who those people might have been—were necessarily divided.

ABC did have advice from Jonathan Barzilay, an in-house Capital Cities attorney. Barzilay advised ABC that the undercover investigation of Food Lion would not violate any laws as long as the undercover reporters adequately performed their Food Lion jobs. While this lowers the reprehensibility of ABC's actions, the jury found that ABC did act with a consciousness of wrongdoing

The ratio of punitive to actual damages for ABC is 1,071 to 1. Even with the potential harm added in, the ratio is still dispropor-

tionate. Even though a large award might be necessary to deter a company with the resources of ABC, an award large enough to accomplish that task fails to survive the scrutiny of other due process factors such as reprehensibility and ratio of actual and potential harm to punitive damages. Therefore, the current punitive damage award does not survive due process review. Still, a proportionally higher award against ABC is justified because ABC is responsible for the actions of all of its employees. Therefore, a new trial will be ordered unless Food Lion remits all punitive damages over $250,000 ($125,000 in North Carolina and $125,000 in South Carolina).

### 3. Richard N. Kaplan

■ Richard Kaplan was the executive producer of *PrimeTime Live* during the time of the Food Lion investigation. The jury awarded $17,500 in punitive damages for Richard Kaplan's conduct relating to the fraud in South Carolina and $17,500 for the fraud relating to the actions in North Carolina. During the trial, there was evidence from which the jury could conclude that Kaplan was involved in the discussions and approval of the plan to go into Food Lion.

As executive producer, Kaplan was ultimately responsible for the activities at *PrimeTime Live*. There was evidence that he was involved in discussions about the plan to go undercover into Food Lion. As a manager, he is responsible for encouraging and condoning what was ultimately found to be fraud. Kaplan did have advice from Barzilay, an in-house Capital Cities attorney that the plan about to be implemented would not violate the law. The fact that he had this advice mitigates the reprehensibility of his actions.

The ratio of punitive damages to actual harm is 25 to 1. When potential harm is added in, the ratio potentially becomes a nonfactor. Under the South Carolina factors of ability to pay and amount necessary to deter, however, a smaller award is justified against an individual, such as Kaplan. In addition, Kaplan's actions were no more reprehensible than Ira Rosen's actions which will be discussed below. As will be seen below, Rosen was much more directly involved in the conduct of the investigation. To the extent that his involvement was greater than Kaplan's, the reprehensibility of his actions was likewise greater. The only factor which could potentially support a higher award against Kaplan than the award against Rosen is the difference in the incomes of the two men. This factor alone is not sufficient to overcome other considerations. Therefore, a new trial will be ordered unless Food Lion files a remittitur of all amounts of punitive damages assessed against Richard Kaplan which are greater than $7,500.

### 4. Ira Rosen

■ Ira Rosen was a senior producer at *PrimeTime Live* during the Food Lion investigation. The jury awarded $5,375 in punitive damages for Ira Rosen's conduct relating to the fraud in South Carolina and $5,375 for the fraud relating to the actions in North Carolina. There was evidence from which the jury could conclude that Rosen's approval of the operation was required and that he authorized and supervised the operation while it was on-going. During the investigation, the undercover reporters were in contact with Rosen. Rosen approved of and assisted in accomplishing the fraud. However, Rosen had advice from an in-house Capital Cities attorney that the action about to be undertaken by ABC would not violate the law. The presence of that advice mitigates the reprehensibility of his actions.

The ratio of punitive damages to actual harm is approximately 7.6 to 1. When potential harm is added in, the ratio becomes a non-factor. Even still, the degree of reprehensibility of Rosen's actions, combined with the fact that he is an individual, and given his salary and position indicates that the current award against him is excessive. A new trial will therefore be ordered unless Food Lion files a remittitur of all amounts of punitive damages awarded against Ira Rosen over $7,500.

### VI.

For the reasons stated above, Defendants' Motion for Judgment as a Matter of Law on Claims of Fraud, Trespass, and Breach of

Fiduciary Duty is denied. The motion by Capital Cities/ABC, Inc. for Judgment as a Matter of Law on All Claims is denied. Defendants' Motion for Judgment as a Matter of Constitutional Law on Punitive Damages is denied. Defendants' Motion for New Trial on Punitive Damage Award is denied on the condition that Plaintiff file a remittitur of all punitive damage amounts above $50,000 from Capital Cities, $250,000 from American Broadcasting Companies, $7,500 from Richard Kaplan and $7,500 from Ira Rosen.