345 F.3d 1366
 Rhone-Poulenc Agro, S.A. (Now known as Aventis CropScience, SA), Plaintiff-Appellee,
v.
DeKalb Genetics Corporation (Now known as Pharmacia Corporation), Defendant-Appellant, and Monsanto Company, (Now known as Pharmacia Corporation), Defendant.
 No. 00-1218.
 No. 00-1350.
 United States Court of Appeals, Federal Circuit.
 Decided September 29, 2003.
 
 George Pazuniak, Connolly Bove Lodge & Hutz LLP, of Wilmington, Delaware, for plaintiff-appellee. With him on the brief were Rudolf E. Hutz and Francis DiGiovanni. Of counsel was Richard D. Levin.
 John F. Lynch, Howrey Simon Arnold & White, LLP, of Houston, Texas, for defendant-appellant. With him on the brief were Richard L. Stanley and Steven G. Spears. Of counsel were Lisa J. Saks, of Washington, DC, and Michael E. Lee, of Houston, Texas, Howrey Simon Arnold & White, LLP; and Donald L. Traut, Dekalb Genetics, Legal Department, of Dekalb, Illinois.
 Before CLEVENGER, SCHALL and DYK, Circuit Judges.
 CLEVENGER, Circuit Judge.
 
 
 1
 DeKalb Genetics Corporation ("DeKalb") appealed the fraudulent inducement, trade secret misappropriation, and patent infringement jury verdicts in favor of Rhône-Poulenc Agro, S.A. ("RPA"), as well as the award of punitive damages and several related post-trial rulings made by the district court. On November 19, 2001, this court issued a ruling which affirmed the appealed jury verdicts and district court rulings. Rhone-Poulenc Agro SA v. DeKalb Genetics Corp., 272 F.3d 1335 (Fed.Cir.2001) (Rhone-Poulenc II). DeKalb petitioned the Supreme Court for review, and on April 23, 2003, the Court granted certiorari, vacated our decision, and remanded the case to this court for reconsideration in light of State Farm v. Campbell, 538 U.S. ___, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). DeKalb Genetics Corp. v. Bayer CropScience, S.A., ___ U.S. ___, 123 S.Ct. 1828, 155 L.Ed.2d 662 (2003).
 
 
 2
 Following remand from the Supreme Court, we recalled our mandate and reinstated the appeal. Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 66 Fed. Appx. 874, 875 (Fed.Cir.2003) (nonprecedential order). We further requested additional briefing from the parties regarding the applicability of State Farm to the current case. Id. Based on the Supreme Court's instruction and the supplemental briefing from the parties, we have reconsidered this case and, once again, affirm the judgment entered by the district court.
 
 
 3
 * Because we have previously discussed the background of this patent dispute in detail, Rhone-Poulenc II, 272 F.3d at 1340-43, we need not repeat it here. We provide only the relevant facts salient to the instant disposition.
 
 
 4
 From 1991 through 1994, RPA and DeKalb collaborated on the development of biotechnology related to the genetic material of plant seeds. Id. at 1341. As part of this collaboration, RPA provided DeKalb with new genetic material, and in exchange DeKalb would test the material and share the results of its testing with RPA. Id. During the collaboration, scientists at RPA developed an optimized transit peptide ("OTP") with a particular maize gene, which proved useful in growing herbicide-resistant corn plants. Id. Per their agreement, RPA provided DeKalb the OTP-containing genetic material in February of 1993. Id. Although DeKalb shared with RPA its initial greenhouse test results on OTP-containing corn, DeKalb never sent the results of its subsequent successful field tests to RPA. Id. at 1341-42. Instead, DeKalb used the field test results to backcross the successful OTP-containing corn plants with commercial corn varieties, thus gaining an advantage on any potential competition. Id. at 1342.
 
 
 5
 By withholding its knowledge of the successful field test results, DeKalb was able to negotiate a more advantageous agreement with RPA in 1994. Id. Through that new 1994 agreement, DeKalb received a $500,000 payment from the settlement of a lawsuit between RPA and Monsanto related to the OTP genetic material, world-wide paid-up right to the technology, and the right to grant sublicenses to that technology. Id. The 1994 RPA-DeKalb agreement "amounted to a complete surrender of RPA's exclusive rights to the technologies." Id. Eventually, DeKalb developed a commercially successful corn line which, thanks to the OTP-containing material, was resistant to herbicide. Id.
 
 
 6
 On October 30, 1997, RPA filed suit against DeKalb and Monsanto, seeking, inter alia, to rescind the 1994 Agreement on the ground that DeKalb had procured the license by fraud. Id. at 1343. RPA also alleged that DeKalb and Monsanto were infringing RPA's patent and had misappropriated RPA's trade secrets. Id. At DeKalb's request, the district court bifurcated the trial between two different juries, with the first jury deciding the licensing and technology transfer issues and the second jury deciding the trade secret and patent infringement claims. Id.
 
 
 7
 The first jury trial resulted in a judgment in favor of RPA that DeKalb fraudulently induced RPA to enter into the 1994 Agreement. Id. The first jury awarded RPA $1 in nominal damages, $15 million in unjust enrichment recovery, and $50 million in punitive damages. Id. RPA also was awarded rescission of the 1994 agreement. Id. The second jury trial similarly resulted in a judgment in favor of RPA on both the trade secret misappropriation and the patent infringement claims. Id. RPA and DeKalb then entered into a stipulated agreement regarding damages for trade secret misappropriation and patent infringement. Id.
 
 
 8
 In its appeal to this court, DeKalb challenged the fraudulent inducement, trade secret misappropriation, and patent infringement jury verdicts, as well as the award of punitive damages and several related post-trial rulings by the district court. Id. at 1340. On review, we affirmed the district court's judgment. Id. at 1343-60. In particular, we held that the jury's verdict finding that DeKalb fraudulently induced RPA to enter into the 1994 Agreement was supported by substantial evidence, id. at 1343-47, and that the jury's award of punitive damages was not unconstitutionally excessive in light of the Supreme Court's latest pronouncements on the constraints imposed by the Due Process Clause on punitive damages awards, id. at 1347-53 (citing Cooper Indus. v. Leatherman Tool Group, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). In our application of Supreme Court precedent to the punitive damages award, we carefully discussed and applied the three Gore factors: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id. at 1347-48. On the issue of reprehensibility of DeKalb's actions, our independent review of the record indicated that, by a preponderance of the evidence, "DeKalb's conduct was sufficiently reprehensible to support the award of punitive damages." Id. at 1349. We then ruled that RPA suffered substantial harm when DeKalb deprived RPA of the opportunity to profit from the OTP-related technology. Id. at 1350-51. Finally, our review of state statutes related to punitive damages did not indicate that the jury's award of punitive damages was excessive compared to other available sanctions for comparable misconduct. Id. at 1351-52. For those reasons, we affirmed the award of punitive damages.
 
 
 9
 As required by the Supreme Court's instruction, we now reexamine our original opinion in light of State Farm.
 
 II
 
 10
 In State Farm, the Supreme Court elaborated on the constraints placed by the Due Process Clause on the discretion of juries and courts over both the severity of recognized misconduct for which punitive damages may be imposed and the amount of such penalty that may be constitutionally awarded for particular offenses. Given its narrow focus on punitive damages awards, State Farm does not affect other issues related to liability or compensatory damages. Consequently, our holdings regarding fraudulent inducement, rescission of the 1994 agreement, inequitable conduct, obviousness, and trade secret misappropriation remain unaffected by the ruling of State Farm and are restored in their entirety.
 
 
 11
 In addition, the central holding of State Farm has no bearing on this case. In State Farm, the Supreme Court reversed the Utah Supreme Court's decision upholding an award of punitive damages that was punishing out-of-state conduct, ___ U.S. at ___-___, ___, 123 S.Ct. at 1521-24, 1526, holding that "[a] State cannot punish a defendant for conduct that may have been lawful where it occurred," id. at 1522. Thus, the Supreme Court focused on where the conduct being punished occurred, not the conduct itself. In contrast, the conduct itself is at issue in this case, and there is no claim that the punitive damages award in this case punished out-of-state conduct.
 
 III
 
 12
 We must, however, address the question of whether State Farm requires us to change our conclusion as to the constitutionality of the punitive damages award in this case. We conclude that our previous decision is unaffected by State Farm.
 
 
 13
 In its post-remand brief, DeKalb raises three arguments to justify the modification of our original holding on punitive awards. First, DeKalb contends that, since our original opinion had acknowledged that none of the Gore factors for reprehensibility was present, the award of punitive damages is now infirm in light of State Farm. Second, the appellant again challenges the $50 million in punitive damages as disproportionate to RPA's harm. Finally, DeKalb submits that the punitive damages award cannot stand because it allegedly exceeds the authorized civil penalty under state law. We are unconvinced by those arguments for the following reasons.
 
 
 14
 * Under State Farm, DeKalb's conduct is reprehensible and thus satisfies the first prong of the Gore test. In our original opinion, we stated that "[i]t is true that the facts alleged herein do not demonstrate any of the criteria enhancing reprehensibility mentioned in Gore, such as an act of violence, disregard for the health and safety of others, a pattern of misconduct, or the exploitation of a financially vulnerable target." Rhone-Poulenc II, 272 F.3d at 1349 (citing Gore, 517 U.S. at 576, 116 S.Ct. 1589). When we issued our opinion, DeKalb's actions did not squarely fit the reprehensibility criteria listed in Gore. In fact, Gore only listed four such criteria, see Gore, 517 U.S. at 576, 116 S.Ct. 1589, all of which we considered in our original opinion. We did not consider a party's intentional malice to be one of the Gore factors, since only one member of the Gore Court specifically identified malice as a criterion to be considered in the reprehensibility assessment. See id. (acknowledging that "[i]ndeed, for Justice Kennedy, the defendant's intentional malice was the decisive element in a `close and difficult' case").
 
 
 15
 In State Farm, however, the Supreme Court expanded the list of specifically identified criteria that lower courts must use to determine a defendant's reprehensibility:
 
 
 16
 "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, supra, at 575, 116 S.Ct. 1589. We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. 517 U.S. at 576-577, 116 S.Ct. 1589. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.
 
 
 17
 State Farm, ___ U.S. at ___, 123 S.Ct. at 1521 (emphasis added). Among the specific factors weighing in favor of sustaining a punitive damages award, the State Farm Court explicitly listed "intentional malice, trickery, or deceit." Id. For the Court's majority, that factor has become an important criterion of what the Constitution accepts as reprehensible conduct. Although we did not originally consider intentional malice as a criterion of reprehensibility, specifically identified in Gore, we held that the lack of credibility of DeKalb's witnesses supported the jury's finding of reprehensibility as to DeKalb's conduct. Rhone-Poulenc II, 272 F.3d at 1349. The Supreme Court's addition of "intentional malice, trickery, or deceit" as a specifically identified criterion for determining reprehensibility directly supports this holding. See State Farm, ___ U.S. at ___, 123 S.Ct. at 1521.
 
 
 18
 In this case, DeKalb acted with "intentional malice, trickery, or deceit" in fraudulently inducing RPA to enter into the 1994 agreement. The first jury heard witnesses' testimony and considered documentary evidence on that issue, and found by preponderant evidence that DeKalb committed actual fraud against RPA. Rhone-Poulenc II, 272 F.3d at 1344. Specifically, to reach its verdict, the jury had to find under applicable state law that, inter alia, DeKalb materially misrepresented a past or existing fact, doing so definitely and specifically, with knowledge of its falsity or in culpable ignorance of its truth, and with intention that the misrepresentation should be acted upon. Id. Those findings, which were supported by substantial evidence, indicate that DeKalb acted with the necessary intentional malice, trickery or deceit to satisfy Gore's requirement of reprehensibility.
 
 
 19
 In sum, DeKalb cannot rely on our original opinion's acknowledgment that none of the explicit Gore factors had been met. State Farm expanded the criteria that we must consider in determining reprehensibility, and under the Court's additional criteria, DeKalb's fraudulent actions constituted reprehensible misconduct.
 
 B
 
 20
 DeKalb contends that, under State Farm, the $50 million in punitive damages unconstitutionally exceeded the $15 million in compensatory damages awarded by the jury. That argument does not withstand scrutiny.
 
 
 21
 The Court explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." State Farm, 123 S.Ct. 1513. Although its precedent indicates that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." Id. In this case, the proportion of punitive damages to compensatory damages does not even approach the possible threshold of constitutional impropriety. The $50 million punitive award is barely above three times the compensatory award of $15 million in this case. That ratio remains within the "[s]ingle-digit multipliers [which] are more likely to comport with due process," id. at 1516, not even reaching the 4-to-1 ratio mentioned by the Court as a threshold where the punitive award may become suspect. Given the egregious nature of DeKalb's fraudulent conduct in this case, this low ratio of punitive to compensatory damages award lies well within the bounds of constitutional propriety.
 
 C
 
 22
 Finally, DeKalb contends that our original opinion improperly applied the third Gore prong by comparing the $50 million in punitive damages award to criminal sanctions. We reject that argument because State Farm did not proscribe the comparison of criminal penalties authorized for the conduct in question to the punitive damages awarded. Although State Farm emphasized the use of comparable civil sanction for the third guidepost of Gore and stated that criminal penalties have "less utilities" in such inquiry, State Farm, ___ U.S. at ___, 123 S.Ct. at 1526, it did not prohibit such comparison. In fact, the Court explicitly acknowledged that "in the past, we have also looked to criminal penalties that could be imposed." Id. (citing Gore, 517 U.S. at 583, 116 S.Ct. 1589; Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). As the Court stated, "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action." Id. Thus, contrary to DeKalb's contentions, State Farm does not prohibit the use of comparable criminal sanctions; the Court merely cautioned against using punitive civil damages "to assess criminal penalties." Id. Consequently, the analysis of the third guidepost in our original opinion is consistent with State Farm.
 
 IV
 
 23
 As mandated by the Supreme Court, we have reconsidered our original decision in this case in light of State Farm. Based on this reconsideration and as explained above, we again hold that there is no constitutional infirmity in the award of punitive damages. And because State Farm did not affect our rulings regarding the other liability and compensatory damages issues, they are unaffected by the Supreme Court's opinion. Consequently, we reinstate our original opinion, as modified by this instant ruling.
 
 
 24
 
 AFFIRMED.